# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JACQUELYN CHIAO, *et al.*
    *Plaintiffs,*

v.                                                         Civil Action No. ELH-25-687

UNITED AIRLINES, INC.,
    *Defendant.*

## MEMORANDUM OPINION

In this race discrimination and tort case, plaintiffs Jacquelyn Chiao, Christine Kim, Adriana Parvanova, and Danielle Simmons filed suit against United Airlines, Inc. ("United"), asserting claims under federal and Maryland law.[1]  ECF 25 ("Amended Complaint").[2]  At the relevant time, plaintiffs were co-workers who were traveling together in connection with work.  They allege that United barred Kim, an "Asian woman," from reboarding the airplane after falsely claiming that Kim "had pushed a flight attendant."  *Id.* ¶ 5.  Thereafter, all of the plaintiffs were barred from reboarding the airplane and "were escorted out of the airport by armed police officers at the behest of United personnel."  *Id.* ¶ 10.

The Amended Complaint contains four causes of action, which I shall sometimes refer to as counts. The "First Cause Of Action," brought only by Kim, asserts racial discrimination, in violation of 42 U.S.C. § 1981.  *Id.* ¶¶ 61–65.  The remaining counts are lodged by all the plaintiffs. The "Second Cause Of Action" asserts intentional infliction of emotional distress ("IIED").  *Id.* ¶¶

---

[1] The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  Subject matter jurisdiction is also founded on diversity, under 28 U.S.C. § 1332.  As to the State law claims, the Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

[2] Plaintiffs initially filed suit on March 5, 2025.  ECF 6.  The First Amended Complaint followed on June 12, 2025.  ECF 25.

66–74.  The "Third Cause Of Action" is titled "Negligence/Breach Of Duty".  *Id.* ¶¶ 75–82.  And, the "Fourth Cause Of Action" asserts "Defamation/Slander/Libel[.]"  *Id.* ¶¶ 83–89.  Plaintiffs have since withdrawn the claim for IIED.  ECF 39 at 1.

Defendant has filed a "Partial Motion To Dismiss" the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 36.  It is supported by a memorandum (ECF 36-1) (collectively, the "Motion") and two exhibits.  In particular, United urges the Court to dismiss the negligence claim on the ground that it is preempted by the Airline Deregulation Act of 1978 ("ADA"),  49 U.S.C. § 40101 *et seq.*  ECF 36-1 at 7.  Additionally, United seeks dismissal on the ground that "Plaintiffs have not alleged a physical injury that is required to recover emotional distress damages under a negligence theory."  *Id.* at 8.

Plaintiffs oppose the Motion.  ECF 39 (the "Opposition").  United replied.  ECF 40.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, with leave to amend.

## I.    Factual Background[3]

Plaintiffs are co-workers who reside and work in Virginia.  ECF 25, ¶¶ 18–21, 23.  Chiao and Kim are Asian, *id.* ¶¶ 18, 19, and Parvanova and Simmons are Caucasian.  *Id.* ¶¶ 20, 21.  In August 2024, they traveled to a work-related real estate convention in Las Vegas, and were joined by their colleague, John Doe.  *Id.* ¶¶ 24, 26.

The group left Las Vegas on August 29, 2024.  *Id.* ¶ 28.  On that date, they boarded United Flight 1627, heading to Washington Dulles International Airport ("IAD").  *Id.*  But, "after arriving" at IAD, the flight was "diverted" because of "bad weather."  *Id.*  The plane circled "for 45 minutes

---

[3] As discussed, *infra,* at this juncture I must assume the truth of the facts alleged in the suit.  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019).  Therefore, the factual summary derives from plaintiffs' Amended Complaint.  ECF 25.

to an hour" and was then "re-routed to" Baltimore/Washington International Thurgood Marshall Airport ("BWI"), where it landed at 5:30 PM. *Id.* ¶¶ 29, 30. However, the passengers "were required to remain on" the plane "for five hours before being allowed to disembark the aircraft[.]" *Id.*; *see id.* ¶¶ 40, 41. Plaintiffs assert that the duration of time was "in violation of Federal Aviation Regulations", citing 14 C.F.R. 259. *Id.*

On the plane, Doe was seated in row 8, next to Simmons. *Id.* ¶ 31. Kim was in seat 15 F. *Id.* ¶ 43. During the fourth hour of "this five hour wait" on the tarmac, Doe "began sweating profusely and experiencing chest pain[.]" *Id.* ¶ 31. Simmons "witnessed" the "difficulties" that Doe was experiencing. *Id.* Chiao, Parvanova, and an unidentified male passenger were standing in the aisle of the aircraft, near Simmons, and also witnessed Doe's condition. *Id.* ¶ 32.

Doe "press[ed] the call button for a flight attendant." *Id.* ¶ 31. According to plaintiffs, when the flight attendant arrived, she "rudely asked" Doe "if he was having a heart attack." *Id.* ¶ 33. Doe "indicated that he had no idea if he was having a heart attack." *Id.* The flight attendant "left and came back with a phone[.]" *Id.* ¶ 34. Plaintiffs claim that the flight attendant "belatedly offered [Doe] an oxygen mask." *Id.* But, Doe "declined to wear the mask" because he "was concerned about its cleanliness due to prior use and reuse[.]" *Id.*

The flight attendant "continued to question" Doe "about his condition, minimizing the potential seriousness of his condition by stating, 'Oh, okay. So, you're just having a panic attack.'" *Id.* ¶ 35. The plaintiffs claim this was a "determination" the flight attendant "was patently unqualified to make." *Id.*

Chiao, who was "present" during the questioning, "asked the flight attendant why she was being so rude and to show a little compassion to a passenger who was clearly in distress." *Id.* ¶ 36. According to plaintiffs, "the flight attendant smirked, gave a snarky response, witnessed by more

than one of the passengers, and abruptly walked away." *Id.* ¶ 37.  Throughout this conversation, the flight attendant did not "make an announcement to attempt to ascertain the presence of medical professionals on board the aircraft who could assess Mr. Doe." *Id.* ¶ 39.  Parvanova and an unidentified male passenger were standing between Chiao and the flight attendant during this interaction. *Id.* ¶ 38.

More than five hours after the plane had landed at BWI, and an hour after Doe called for help, "all of the passengers were allowed to deboard the plane onto the tarmac." *Id.* ¶ 40.  Until then, the passengers had not been "offered the opportunity to deplane[.]" *Id.* ¶¶ 41, 42.

The process of reboarding the plane began after plaintiffs waited an additional hour "outside an airline gate." *Id.* ¶ 44.  Chiao and Doe were in Group 2, and "were the first among those involved in the incident to board the plane." *Id.* ¶ 45.  Kim, Simmons, and Parvanova were in Groups 3–5. *Id.* ¶ 46.  As Kim attempted to reboard the plane, "she was pulled aside by the gate agent and informed that the captain decided not to allow her back on the flight." *Id.* ¶ 47.  Kim asked the basis of the decision and was told that "there was no other reason other than the captain was the deciding factor and she was not allowed back on the plane." *Id.* ¶ 48.

Kim informed the other plaintiffs that she was not permitted to reboard the plane. *Id.* ¶ 49.  Simmons and Parvanova asked "the agents why they were refusing to allow" Kim to board the plane. *Id.* ¶ 50.  Kim was reduced to "tears as a result of the maltreatment from the United employees[.]" *Id.* ¶ 51.  When Simmons and Parvanova saw that Kim was in distress, they "stepped out of line to support her while they attempted to gain clarification as to why she was being treated differently." *Id.*  Simmons also called Chiao, "who had already boarded" the aircraft, and told Chiao "what had occurred." *Id.* ¶ 52.  Chiao, "the only Asian plaintiff who had an interaction with the flight attendant, disembarked the plane, as did the pilot." *Id.* ¶ 53.

In response to questions as to why Kim had been "denied access to the aircraft", the pilot "informed" the plaintiffs "that a flight attendant reported that she had been physically assaulted by a female Asian passenger." *Id.* ¶ 54. However, neither Kim nor Chiao, both of whom are Asian, "made any physical contact with any of the airline employees[.]" *Id.* ¶ 55. Plaintiffs assert that this fact "can be attested to by the other Plaintiffs as well as the passengers on the aircraft." *Id.*

Then, all four plaintiffs "were wrongfully denied boarding to the aircraft and were separated from their luggage, which remained on the aircraft as it travelled to IAD." *Id.* ¶ 56. And, at the request of United employees, "all of the Plaintiffs were escorted out of the airport by armed police officers[.]" *Id.* ¶ 57.

According to plaintiffs, "[a]t no point did" they "voluntarily decide not to board the plane." *Id.* ¶ 58. Plaintiffs posit that "Kim was denied" permission to reboard "because of her race while Plaintiffs Chiao, Parvanova, and Simmons were denied access in retaliation for their attempts to understand and resolve the situation." *Id.*[4]

Plaintiffs allege that, as a result of this incident, Kim "suffered, and continues to suffer, severe mental anguish and emotional distress[.]" *Id.* ¶ 64. Additionally, all the plaintiffs claim that they "endured" "emotional and mental anguish" and "humiliation" because of United's conduct, including: "racial discrimination of Plaintiff Kim, falsely accusing [plaintiffs] of causing a disturbance, denying [plaintiffs] access to their aircraft, and [the] forcible removal [of the plaintiffs] from the airport by armed officers[.]" *Id.* ¶¶ 78, 88.

---

[4] Plaintiffs claim that "a traveling United Airlines employee" witnessed the events set forth in the Amended Complaint. ECF 25, ¶ 59. Plaintiffs have not disclosed the employee's identity to "protect this United employee from retaliation, workplace backlash, or other harm to employment[.]" *Id.* ¶ 60. However, plaintiffs assert that they will disclose this employee's identity "in discovery once a protective order is entered in this case." *Id.*

## II.    Legal Standards

Pursuant to Rule 12(b)(6), United seeks dismissal of Count III, which alleges "Negligence/Breach of Duty".  ECF 36 at 1; *see* ECF 25, ¶¶ 75–82.  Plaintiffs assert that United "had a duty to protect the plaintiffs from injury, mental, emotional, or physical, while they were in Defendant's care."  ECF 25, ¶ 76.  And, they claim defendant breached the duty by engaging in "racial discrimination and maltreatment . . ."  *Id.* ¶ 77.  Additionally, plaintiffs allege that United "had a duty to transport all of the Plaintiffs to their final destination as long as the [sic] complied with the carrier's contract of carriage."  *Id.* ¶ 79.  According to plaintiffs, United breached its duty "by arbitrarily, and without cause, denying [plaintiffs] access to the aircraft as well as calling for armed law enforcement personnel to parade the Plaintiffs out of the airport as if they were criminals after falsely accusing them of causing a disturbance, in addition to the false allegation of assault by Plaintiffs Chiao and Kim."  *Id.* ¶ 80; *see also id.* ¶ 78.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ."  *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024).  Whether a complaint states a claim for

relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see Brown-Hyatt v. Brenner*, SAG-25-1737, 2025 WL 2855769, at *2 (D. Md. Oct. 8, 2025) (same).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'"); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  A plausible claim is more than merely conceivable or speculative. *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts]

in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Hebb v. City of Asheville, N. Carolina*, 145 F.4th 421, 432 (4th Cir. 2025); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). Nor does the court accept "'legal conclusions couched as facts . . . .'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (citation omitted).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022); *see Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

A plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Ordinarily, when ruling on a Rule 12(b)(6) motion, a court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023); *Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

A plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing.  *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  Under

limited circumstances, however, a court may consider documents beyond the complaint, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines*, 822 F.3d at 166 (citations omitted); *see also Finn v. Humane Soc'y of the United States*, 160 F.4th 92, 96 n.2 (4th Cir. 2025); *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Sturgis v. Nines*, SAG-25-841, 2025 WL 3240039, at *2 (D. Md. Nov. 20, 2025); *Moody v. The Board of Education Of Wicomico County, Defendant.*, SAG-25-00642, 2025 WL 3119201, at *4 (D. Md. Nov. 7, 2025); *Doriety*, 2024 WL 3558754, at *6. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.*, 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam).

United appended an exhibit to its Motion, which it asks the Court to consider in ruling on its Motion.  ECF 36-1 at 12 n.3.  The exhibit is titled "Maryland Transportation Authority ["MDTA"] Subpoena Response."  ECF 36-2 at 1 (the "Police Report").[5]  The Police Report states

---

[5] The exhibit includes a copy of the Maryland Transportation Authority Police Central Records Unit's response to a subpoena, addressed to KMA Zuckert LLP, the firm representing United.  ECF 36-2 at 2.  The letter indicates that KMA Zuckert LLP requested records regarding

that the MDTA received a call on August 29, 2024, at "23:28 Hrs" and that the incident was closed by "23:34 Hrs[.]" *Id.* at 3. The Police Report lists the address of the incident as "7050 Friendship Road", *i.e.*, the BWI airport, and specifically the "E5 Boarding Area[.]" *Id.* It does not include the name of any of the plaintiffs but refers to "4 female pasgners [sic]" and includes descriptions of each woman's clothing. *Id.* The Police Report includes "remarks" that describe "pasngers [sic] being beligerant [sic] and not allowing people to board the flight" and "yelling at United Airlines Supervisor[.]" *Id.* Additionally, the Police Report states: "[I]ndivs [sic] being escorted to get refunded . . . indivds [sic] escorted off pier[.]" *Id.*

United argues that "[t]he Court may consider the police report" because it "is integral to the FAC." *Id.* at 12 n.3. The Police Report appears to be authentic; it contains the official insignia of the MDTA Police and was submitted with a letter that bears the letterhead of the MDTA Police Headquarters. Notably, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Plaintiffs do not contest the authenticity of the Police Report. Indeed, in plaintiffs' Opposition, they quote from the Police Report. ECF 39 at 10 (quoting ECF 36-2).

---

the "Jacquelyn Chiao Case #1:25-cv-00687-ELH[.]" *Id.* Further, the letter indicates that the MDTA's only record referencing Chiao was a "CAD report", attached to the subpoena response. *Id.*

"CAD" is an abbreviation used by law enforcement officials that stands for "computer aided dispatch[.]" BUREAU OF JUSTICE ASSISTANCE, STANDARD FUNCTIONAL SPECIFICATIONS FOR LAW ENFORCEMENT COMPUTER AIDED DISPATCH (CAD) SYSTEMS vii (last accessed Dec. 1, 2025), https://perma.cc/P492-C7TP. CAD systems are used by law enforcement to "collect the initial information for an incident", and are used to facilitate "incident response and communication in the field." *Id.* at viii, 1. United claims the CAD was generated when MDTA officers removed plaintiffs from the boarding area. ECF 36-2 at 3; ECF 36-1 at 12.

Some courts have found that a police report is integral to a complaint when the report itself is referenced in the complaint, and it is central to the complaint's claims. *See, e.g., Eubank v. Wesseler*, DLB-10-210, 2011 WL 3652558, at *3 (E.D. Ky. Aug. 19, 2011); *compare Ogunsula v. Maryland State Police*, ELH-20-2568, 2021 WL 6105503, at *12 (D. Md. Dec. 23, 2021) (declining to take judicial notice of a police report attached to defendants' motion to dismiss because "plaintiff did not reference these exhibits in her Complaint, nor are they integral to her suit"). In *Wheeler v. Giant of Maryland LLC*, BAH-23-1643, 2024 WL 4171199 (D. Md. Sept. 11, 2024), for example, the defendant attached two police reports to its motion to dismiss. *Id.* at *3 n.3. But, the plaintiff "explicitly referenced" these reports "in the amended complaint" and "quoted verbatim" from one of these reports "in the amended complaint." *Id.* "Out of an abundance of caution", the court reviewed only the report that the plaintiff had quoted in the amended complaint. *Id.*

Here, the Police Report was attached to defendant's Motion. But, as noted, plaintiffs quote from it in their Opposition. *See, e.g.,* ECF 39 at 3, 10. In support of plaintiffs' negligence claim, they allege that the mental anguish they suffered was "due" in part to United "falsely accusing" plaintiffs "of causing a disturbance" and forcibly being removed from the airport "by armed officers . . . ." ECF 25, ¶ 78. Similarly, in support of their claim for "defamation/slander/libel", plaintiffs claim that, "[b]y reporting to law enforcement that Plaintiff Kim and/or Chiao assaulted the Defendant's agent, along with falsely claiming that the other Plaintiffs were causing a disturbance", United had "published certain statements concerning the Plaintiffs." *Id.* ¶ 84. However, plaintiffs never mention the Police Report in their Amended Complaint.

The involvement of the police is of import to the case. But, the Police Report itself is not integral to the Complaint.

United also claims that the Court may consider the Police Report because it is a "public record[.]" ECF 36-1 at 12 n.3. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc.*, 551 U.S. at 322; *Katyle*, 637 F.3d at 466; *Philips*, 572 F.3d at 180. However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

Courts have come to varying conclusions as to whether a police report is a public record. *See Alvarez v. Cnty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 397 (S.D.N.Y. 2015) (comparing cases where courts "have taken judicial notice of . . . police reports,  and similar materials on a motion to dismiss, not for the truth of their contents, but rather to establish their existence" with "[o]ther courts" that "have declined to do so"). Some courts have found that police reports are public records and can be considered by a court in ruling on a motion to dismiss. *See, e.g., Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 551 (D.S.C. 2008) (concluding that "the Court may consider the police report [submitted by defendants in support of their motion to dismiss] as a matter of public record"). But, some courts have cautioned against concluding that a police report is a public record merely because it is "held in a public repository[.]" *Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013). The First Circuit has explained, *Freeman, id.*: "Many documents in the possession of public agencies simply lack any indicia of reliability whatsoever. In that regard, they are unlike official records, such as birth or death certificates and other similar records of vital statistics."

- 14 -

In my view, the Court may take judicial notice of the fact that a Police Report was prepared. But, it would be "improper" to take judicial notice of "[t]he accuracy of the remarks in the report[.]" *Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 326 (E.D. Tex. 2021).

Therefore, I will take judicial notice that the MDTA police created the Police Report in regard to an incident involving four female passengers at the BWI boarding area on August 29, 2024, reflecting police interaction with the plaintiffs. However, I decline to take judicial notice of the accuracy of the content of the Police Report. *See* ECF 36-2 at 3. In any event, the Police Report has little to do with the two issues United raises in its Motion.

### III.    Discussion

### A.  The Sufficiency of the Negligence Claim

### 1.

United contends that plaintiffs have failed to state a negligence claim. It complains that, in the Opposition, plaintiffs "improperly assert and rely on new factual allegations not set forth in" their Amended Complaint "to argue that they have suffered recoverable injuries under their negligence claims." ECF 40 at 1. In other words, United contends that plaintiffs seek to cure their deficient Complaint by way of their Opposition.

In the Amended Complaint, plaintiffs make several factual allegations regarding the emotional damage that they allegedly suffered because of United's conduct. As to Kim, plaintiffs allege that "Kim was in tears" after United barred her from reboarding the plane. ECF 25, ¶ 51. Plaintiffs also claim that, "as a direct and proximate result of United's intentional discrimination . . . Kim suffered, and continues to suffer, severe mental anguish and emotional distress[.]" *Id.* ¶ 64. Further, plaintiffs claim that Kim's "co-workers and fellow Plaintiffs suffered immensely seeing the extreme manner in which [Kim] was being treated, by the Defendant, solely because of her race." *Id.* ¶ 70.

In addition, plaintiffs allege that "all of the Plaintiffs were forced to endure the embarrassment of being denied access to their aircraft, separated from their luggage, and forcibly escorted out of the airport by armed police officers after being falsely accused of causing a disturbance and wrongfully denied boarding." *Id.* ¶ 71; *see also id.* ¶ 81 ("The behavior and actions of the Defendant's agents caused the Plaintiffs a great deal of hardship, embarrassment and suffering, causing their mental and emotional suffering."); *id.* ¶ 82 (asserting that plaintiffs "suffered and continue to endure" "mental and emotional pain and suffering"); *id.* ¶ 88 ("Plaintiffs have sustained legally presumed damages, including, but not limited to, embarrassment, humiliation, mental suffering[.]").

To be sure, in their Opposition, plaintiffs expand on their allegations regarding emotional suffering.  For example, in the Opposition, plaintiffs assert that after Kim was denied permission to reboard, "the other Plaintiffs were in vary [sic] states of shock, confusion, and pain." ECF 39 at 3.  They elaborate, *id.* at 6 (emphasis added):

> This incident left Plaintiffs *feeling frightful for their futures due to the damage a false criminal accusation can do to one's reputation, particularly as realtors.* Further, *the Plaintiffs were left shaking, in tears, embarrassed, confusion [sic], exhausted, and feeling completely hopeless after, in full view of those in the airport, as if they were violent offenders unfit for air travel.* Plaintiff Kim's emotional state was so severe during this incident, *she couldn't even speak. Not one of the Plaintiffs are able to think about this incident, or enter an airport, without all of these feelings rushing to the forefront. This horrific incident led to sleepless nights and feelings of worthlessness*, emotions caused, not by the actions of the Plaintiffs, but by the malevolence and dishonesty of the Defendant's employees.

As I see it, the Opposition adds detail to allegations in the Complaint regarding the emotional trauma that plaintiffs allegedly experienced.  However, in assessing the sufficiency of the allegations, I may only consider the allegations in the suit, and not the additional assertions set forth in the Opposition.

**2.**

As noted, plaintiffs have lodged three claims arising from the incident.  In Count I, Kim asserts racial discrimination, pursuant to 42 U.S.C. § 1981.  Plaintiffs assert negligence in Count III.  And, they assert defamation in Count IV.  ECF 25, ¶¶ 61–65, 75–82, 83–89.

United claims that plaintiffs fail to state a claim for negligence.  Instead, argues United, plaintiffs "confusingly conflate the focus of their negligence claims with their other claims" of "racial discrimination and false reporting" that "are the basis of" Kim's "Section 1981 racial discrimination claim and Plaintiffs' defamation claims[.]"  ECF 40 at 7; *see id*. at 10.  In essence, United contends that the substance of the negligence claim is embodied in the claims for race discrimination and defamation, but it is not an independent, viable claim of negligence.

In general, to assert a claim of negligence in Maryland, "a complaint must allege facts sufficient to support a finding of: 1) a duty to the plaintiff (or to a class of which the plaintiff is a part), 2) a breach of that duty, and 3) a causal relationship between the breach and the harm, and 4) damages suffered."  *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App. 420, 438, 130 A.3d 1024, 1034 (2016), *aff'd*, 451 Md. 600, 155 A.3d 445 (2017); *see Steamfitters Loc. Union No. 602 v. Erie Ins. Exch. No. 40*, 469 Md. 704, 727, 233 A.3d 59, 72 (2020); *Schultz v. Bank of Am.*, N.A., 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010); *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655, 762 A.2d 582, 587 (2000); *Jacques v. First Nat. Bank of Md.*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986); *Cramer v. Hous. Opportunities Comm'n of Montgomery Cnty.*, 304 Md. 705, 712, 501 A.2d 35, 39 (1985).  Some courts describe the damages element as the "actual injury or loss" that the "plaintiff suffered[.]" *Steamfitters Loc. Union No. 602*, 469 Md. at 727, 233 A.3d at 72; *see Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 610, 155 A.3d 445, 451 (2017); *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212–13, 60 A.3d 1, 10 (2013).

- 17 -

In regard to plaintiffs' negligence claim, they contend that United "had a duty to protect the Plaintiffs from injury, mental, emotional or physical, while they were in the Defendant's care." *Id.* ¶ 76. Additionally, plaintiffs claim that United "had a duty to transport all of the Plaintiffs to their final destination as long as the [sic] complied with the carrier's contract of carriage." *Id.* ¶ 79.

According to plaintiffs, United breached its duty to protect them from injury by engaging in the following conduct, *id.* ¶¶ 77, 78, 80:

> The racial discrimination and maltreatment endured by Plaintiff Kim at the hands of Defendant and its agents . . . [United] falsely accusing [plaintiffs] of causing a disturbance . . . and their forcible removal from the airport by armed officers [and] . . . parad[ing] the Plaintiffs out of the airport as if they were criminals . . . in addition to the false allegation of assault by Plaintiffs Chiao and Kim.

The conduct that plaintiffs cite as a breach of defendant's duty to transport is as follows, *id.* ¶ 80:

> [United] arbitrarily, and without cause, denying [plaintiffs] access to the aircraft as well as calling for armed law enforcement personnel to [remove] the Plaintiffs out of the airport. . . .

The conduct on which plaintiffs rely as the basis for their negligence claim is the same conduct on which the claims of racial discrimination and defamation are premised. To be sure, the same conduct can support multiple legal claims. But, as discussed, *infra*, this is not merely a matter of multiple claims. Rather, plaintiffs do not state a negligence claim.

"[T]here is no reason to allow . . . duplicative requests to proceed in the improper guise of independent causes of action." *Simone v. VSL Pharms., Inc.*, TDC-15-1356, 2017 WL 66323, at *10 (D. Md. Jan. 5, 2017). Notably, "when there is one and only one cause of action, it does not become different because of a misstatement of the time or place, or even the legal theory upon

which liability is based." *Mack Trucks, Inc. v. Webber*, 29 Md. App. 256, 283, 347 A.2d 865, 880 (1975).

For starters, "[m]erely stating that a duty existed, or that it was breached, or that the breach caused the injury does not suffice" to state a claim for negligence. *Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.,* 382 Md. 170, 182, 854 A.2d 1232, 1238 (2004) (adjudicating a claim for negligent supervision). Of import, "[t]he absence of intent is essential to the legal conception of negligence. If the tortious act is intentional, it may be willful, wanton, or fraudulent, but not negligent[.]" *Adams v. Carey*, 172 Md. 173, 190 A. 815, 821 (1937). Indeed, "[i]t has long been established that negligence is not an intentional tort but, instead, arises where an individual's unintentional failure to use reasonable care results in injury to another." *Schuerholz v. Coker*, WMN-15-1990, 2016 WL 6433173, at *3 (D. Md. Oct. 31, 2016).

In Maryland, there is a "narrow exception" to the general proposition that negligence necessarily entails the absence of intent. *Id.* In particular, in Maryland, "the presence of an intent to do an act does not preclude negligence." *Ghassemieh v. Schafer*, 52 Md. App. 31, 40, 447 A.2d 84, 89 (1982). When "'an intentional act'" creates "'unintended consequences'", that act can "'be a foundation for a negligence action.'" *Moore v. Myers*, 161 Md. App. 349, 378, 868 A.2d 954, 971 (2005) (quoting *Ghassemieh*, 52 Md. App. at 40, 447 A.2d at 89); *see also Walser v. Resthaven Mem'l Gardens, Inc.*, 98 Md. App. 371, 393–94, 633 A.2d 466, 476 (1993) ("[A]n act committed intentionally may give rise to an action in negligence if one or more of the harmful consequences of that act are unintended.").

*Walser*, 98 Md. App. 371, 633 A.2d 466, is instructive. This suit arose from the alleged "wrongful internment" of plaintiffs' deceased relative. *Id.* at 377, 633 A.2d 466 at 468. The decedent's father and stepmother had purchased four plots in a cemetery for their family. *Id.* at

378, 633 A.2d 466 at 469.  At the time of the alleged wrongful internment, the decedent, the decedent's father, and the child of decedent's father and stepmother had all died and been buried in this plot.  *Id.*  The final open space in the burial plot was reserved for the stepmother, who was still alive.  *Id.*

If the stepmother had been buried in that spot, she would have been laid to rest next to the decedent and not next to her biological son.  The stepmother "decided that she wanted to be buried next to her natural son . . . and therefore requested [the cemetery] to have the remains of [her stepson] and [her natural son], who were buried next to each other, switched."  *Id.*  When the cemetery received the stepmother's request, it entered into two "Disinterment Agreements, under which it agreed to arrange for the switch" with the stepmother.  *Id.*  No one notified the decedent's other relatives of the "contemplated, or actual, disinterment of" the decedent.  *Id.*  The decedent's relatives only discovered that the switch had been made when they visited the decedent's gravesite.  *Id.*  The decedent's mother and siblings subsequently filed suit against the stepmother, the cemetery, and other defendants who had facilitated the disinterment of the decedent.  *Id.* at 377, 633 A.2d 466 at 468.  They asserted several claims, including negligence.  *Id.* at 378–79, 633 A.2d 466 at 469.  The circuit court dismissed plaintiffs' multi-count complaint, and plaintiffs appealed.  *Id.* at 377, 633 A.2d 466 at 468.

Although plaintiffs brought numerous claims, "the entire complaint rest[ed] on the underlying premise that" the stepmother "was under a legal obligation to consult with" the mother of the decedent and "obtain her consent before proceeding to move" the decedent's body.  *Id.* at 392, 633 A.2d 466 at 476.  The Maryland Court of Special Appeals affirmed the circuit court's dismissal of plaintiffs' claims.  *Id.* at 397, 633 A.2d 466 at 478.  As to the negligence claim, the court noted that plaintiffs had alleged that the stepmother had "'*consciously* decided not to discuss

her plans or request permission for authorization' prior to proceeding with the disinterment[.]" *Id.* at 393, 633 A.2d 466 at 476 (quoting the complaint) (emphasis in original).

The court concluded that it was "evident that" the decedent's mother had "pleaded intentional conduct, not negligent conduct." *Id.* The court acknowledged that in Maryland "an act committed intentionally may give rise to an action in negligence if one or more of the harmful consequences of that act are unintended[.]" *Id.* at 393–94, 633 A.2d 466 at 476. But, it reasoned that "the complaint here avers that both the act and the consequences were intended. That is the essence of a claim of malicious conduct—conduct in "*conscious,*" rather than negligent or even reckless, disregard of the effect on [the decedent's mother]." *Id.* at 394, 633 A.2d 466 at 476–77 (emphasis in original). Therefore, the court concluded that the decedent's mother had "failed to plead an action for negligence or even gross negligence." *Id.*

Maryland courts have also considered the relationship between intentional conduct and negligence in the context of insurance coverage, where litigants have sought to shoehorn intentional conduct into negligence claims. The courts have soundly rejected such a charade.

For example, in *Moscarillo v. Pro. Risk Mgmt. Servs., Inc.*, 398 Md. 529, 543, 921 A.2d 245, 253 (2007), the Maryland Court of Appeals refused to countenance the plaintiff's effort to repackage "intentional torts of fraud and conspiracy to defraud" into "negligent acts[.]" Similarly, in *Saba v. Darling*, 72 Md. App. 487, 491, 531 A.2d 696, 698 (1987)*, aff'd,* 320 Md. 45, 575 A.2d 1240 (1990), the Maryland Court of Special Appeals concluded that because the defendant's alleged conduct "arose from no more or less than a willful, intentional, deliberate assault and battery" it was "hardly . . . negligence[.]"

*Harpy v. Nationwide Mut. Fire Ins. Co.*, 76 Md. App. 474, 482–83, 545 A.2d 718, 722 (1988), is informative. There, the Maryland Court of Special Appeals concluded that the

defendant's conduct, sexual abuse of a child, could not form the basis for a negligence claim because the defendant intended the injury. Indeed, the court characterized the insured's position to the contrary as "absurd." *Id.* at 482, 545 A.2d at 722. Although the court recognized that "an intended act causing unintentional injury, under some circumstances, can be considered negligence," *id.* at 484, 545 A.2d at 723, it reasoned that there is a "substantial certainty that sexual molestation of a child by her father over an extended period of time will cause that child to suffer serious harm." *Id.* at 483, 545 A.2d at 723. The court reasoned that "'for the [l]aw to define sex with one's nine to thirteen year-old daughter to be anything but intentional injury is ridiculous.'" *Id.* at 482–83, 545 A.2d at 722 (quoting trial judge) (alteration in original).

*Pettit v. Erie Ins. Exchange,* 349 Md. 777, 709 A.2d 1287 (1998), followed *Harpy* by some ten years. It is also instructive. There, the insurer brought a "declaratory judgment action concerning personal liability insurance coverage for a pedophile who was sued for sexual child abuse . . . . purportedly under several theories of negligence." *Id.* at 779, 709 A.2d at 1288. The Maryland Court of Appeals upheld the applicability of "the exclusion for injuries expected or intended by the insured . . . despite the pedophile's subjective belief that his conduct caused no harm." *Id.* at 778–79, 709 A.2d 1287, 709 A.2d at 1288.

The insured sexually abused two boys, one aged seven and the other nine years old when the abuse began. *Id.* at 779, 709 A.2d at 1288. He also "encouraged and permitted others to molest the boys" and "videotaped these activities." *Id.* The tort plaintiff, who was mother and next friend of the victims, was also a defendant in the insurance company's declaratory action. She acknowledged that the insured "intended to engage in the conduct constituting sexual acts and contacts," but argued that the insurance policy covered his conduct because the insured subjectively "believed that the sexual acts and contacts were not harmful to the children." *Id.* at

785, 709 A.2d at 1291.   In rejecting this contention, the Maryland Court of Appeals stated: "[S]exual molestation is a tort which is only committed intentionally.   There is no dichotomy between the 'damages' resulting from [the insured's] conduct and his intent to perform the acts of sexual child abuse." *Id.* at 786, 709 A.2d at 1292.   Notably, the court also determined that declaratory relief in favor of an insurer is "appropriate prior to trial of the tort action where the allegations in the underlying tort claims obviously constitute a patent attempt to recharacterize, as negligent, an act that is clearly intentional.'" *Id.* at 780, 709 A.2d at 1289 (quoting *Allstate Ins. Co. v. Atwood,* 319 Md. 247, 253, 572 A.2d 154, 157 (1990)).

Thereafter, in *Lititz Mutual Insurance Co. v. Bell,* 352 Md. 782, 724 A.2d 102 (1999), the Maryland Court of Appeals extended the logic of *Pettit* and *Harpy* to the tort of battery.   In that case, insurance coverage turned on whether a punch thrown by a psychiatric patient with "intermittent explosive disorder" could be characterized as negligent or, instead, intentional as a matter of law.   *See id.* at 783–91, 724 A.2d 102, 724 A.2d at 102–07.   Relying on a concession by the insured's counsel at oral argument that the insured intended to throw the punch, *id.* at 795–97, 724 A.2d at 108–10, the *Lititz* Court held that the alleged battery could not constitute negligence, stating, *id.* at 798, 724 A.2d at 110 (internal citations omitted):

> [W]here the facts indicate a battery, the harm is the contact itself. The acts of sexual molestation in *Pettit* were acts of battery, and the rationale of the decision is framed in the law of battery . . . . If [the patient] had not intended the contact itself due to a mental condition, then the act might be considered an "accident" and not intentional because the contact (the harm) would have taken place without his foresight or expectation. However, where the actor intends to cause an offensive contact, the legally recognized harm, *ipso facto,* cannot be said to have taken place without his foresight or expectation.

Applying the logic of the cases cited above, it is clear that the conduct alleged by plaintiffs under the guise of negligence was clearly intentional conduct with intended consequences. Plaintiffs' attempt to characterize the conduct as negligent is unavailing.   Again, "[p]leading in the

alternative, and even making alternative arguments, is entirely permissible. *Hammons v. Univ. of Maryland Med. Sys. Corp.*, 649 F. Supp. 3d 104, 124 (D. Md. 2023). But, the facts alleged here in support of the negligence claim correspond to the facts that undergird the claims of discrimination and defamation, which embody intentional conduct; the conduct does not sound in negligence.

To elaborate, plaintiffs allege that United purposely made false statements to police. There is no suggestion that the statements were made unintentionally. Plaintiffs also claim that they were "escorted out of the airport by armed police officers at the behest of the United employees," *i.e.*, that United acted purposely. *Id.* ¶ 57. Clearly, plaintiffs' removal from the airport was an intended consequence of United's conduct in contacting law enforcement.

Similarly, United's conduct towards Kim, as alleged, smacks of intentionality. Plaintiffs claim that Kim was denied permission to board "purely" because of her race and ethnicity. *Id.* ¶ 63. Indeed, plaintiffs refer to the treatment of Kim by United personnel as "intentional discrimination[.]" *Id.* ¶ 64.

Plaintiffs also allege that United unlawfully barred plaintiffs from reboarding the plane. *See* ECF 25, ¶ 47 (describing how Kim "was pulled aside by the gate agent and informed that the captain *decided* not to allow her back on the flight") (emphasis added); *id.* ¶ 58 ("Plaintiffs Chiao, Parvanova, and Simmons were denied access in retaliation for attempts to understand and resolve the situation [involving Kim]."). Clearly, United intended to bar plaintiffs from reboarding the aircraft.

In support of their negligence claim, plaintiffs also assert that defendant had a duty to transport plaintiffs if they "complied with the carrier's contract of carriage." ECF 25, ¶ 79. And,

according to plaintiffs, they "complied with the contract of carriage," but United nonetheless breached its duty to transport them. *Id.* ¶ 80.

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)). United's refusal to transport plaintiffs on its aircraft might be a breach of the parties' contract. But, plaintiffs did not bring a claim for breach of contract. Instead, they seek to characterize a possible contract claim as a negligence claim. Even in the light most favorable to plaintiffs, they do not allege a basis for negligence in regard to the failure to transport.

Plaintiffs' attempt to frame United's conduct as a basis for a negligence claim is akin to trying to fit a square peg in a round hole.[6] However, dismissal of the negligence claim does not shut the courthouse doors to plaintiffs. The conduct set forth in plaintiffs' negligence claim is the basis for Kim's racial discrimination claim and plaintiffs' defamation claim. *Compare* ECF 25, ¶¶ 63–65 *with id.* ¶¶ 77–78; *compare id.* ¶¶ 78, 80 *with id.* ¶¶ 84–89. These two claims are not the subject of the Motion. In any event, I shall grant plaintiffs leave to amend their Complaint.

### 3.

Alternatively, United maintains that plaintiffs' negligence claim fails because plaintiffs "have not alleged a physical injury that is required to recover emotional distress damages under a negligence theory." ECF 36-1 at 8. In United's view, plaintiffs have only asserted emotional injury, which is not compensable unless it is "accompanied by physical harm." *Id.* at 22. It

---

[6] There are cases where, in the context of incidents involving boarding, plaintiffs have alleged claims such as negligent hiring, training, and supervision. *See, e.g.*, *Adams v. U.S. Airways Grp., Inc.*, 978 F. Supp. 2d 485, 488 (E.D. Pa. 2013); *Qayyum v. US Airways, Inc.*, RCC-08-0996, 2008 WL 4879401, at *4 (S.D.W. Va. Nov. 12, 2008); *Woodson v. U.S. Airways, Inc.*, 67 F.Supp.2d 554, 556 (M.D.N.C. 1999). This is not one of those cases.

characterizes plaintiffs' allegations that they suffered "'a great deal of hardship, embarrassment and suffering, causing their mental and emotional suffering'" as "conclusory and general allegations that . . . do not plausibly support a negligence claim[.]" *Id.* at 22–23 (quoting ECF 25 ¶ 81).

Plaintiffs dispute United's characterization of their injuries as conclusory. ECF 39 at 7. They allege that United's conduct in refusing to allow them to reboard and "falsely" accusing plaintiffs "of crimes . . . left Plaintiffs feeling frightful for their futures due to the damage a false criminal accusation can do to one's reputation, particularly as realtors." *Id.* at 6. They add that the incident left them "shaking, in tears, embarrassed, confusion [sic], exhausted, and feeling completely hopeless . . . in full view of those in the airport, as if they were violent offenders unfit for air travel." *Id.* Further, plaintiffs claim that "Kim's emotional state was so severe during this incident, she couldn't even speak." *Id.* Plaintiffs also assert that "[t]his horrific incident led to sleepless nights and feelings of worthlessness[.]" *Id.* And, they posit that "[n]ot one of the Plaintiffs are able to think about this incident, or enter an airport, without all of these feelings rushing to the forefront." *Id.* As discussed, I may only consider the allegations that appear in the Amended Complaint, not in the Opposition.

For a state law claim considered under supplemental jurisdiction, the court applies the law of the forum state, including as to choice of law. *See, e.g.*, *Nash v. Montgomery Cty.*, GJH-20-1138, 2021 WL 1222874, at *7 n.7 (D. Md. Mar. 31, 2021); *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008). In tort actions, Maryland adheres to the rule of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph*, 529 F. Supp. 2d at 606 (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648–49 (2007)) (other citations omitted); *see also DiFederico v. Marriott Int'l,*

*Inc.*, 677 Fed. App'x 830, 833 (4th Cir. 2017).  Because plaintiffs' negligence claim is premised on events that occurred in Maryland, the law of Maryland applies.[7]

As noted earlier, damages is an element of a negligence claim.  *See*, *e.g.*, *Steamfitters Loc. Union No. 602*, 469 Md. at 727, 233 A.3d at 72; *Balfour Beatty Infrastructure, Inc.*, 451 Md. at 610, 155 A3d at 451.  "Generally, a plaintiff may not recover damages in tort for mental distress without a physical impact."  *Wright v. Willow Lake Apartments (MD) Owner, LLC*, 648 F. Supp. 3d 647, 666 (D. Md. 2023) (citing *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 71 A.3d 30, *on reconsideration in part,* 433 Md. 502, 71 A.3d 150 (2013)); *see also Nicholson v. Durant,* 162 F.4th 417, 428 (4th Cir. 2025) ("Maryland courts have indeed vacated jury verdicts for emotional distress damages where plaintiffs experienced no physical manifestation of their emotional distress.")*; Wheeling v. Selene Fin. LP*, 473 Md. 356, 393 250 A.3d 197, 219 (2021) ("In

---

[7] The choice over which standard of care applies to United's conduct implicates the FAA. *See Kelley v. United States*, AJT-08-31, 2009 WL 1439896, at *5 (E.D. Va. Mar. 26, 2009) ("The duties of air traffic controllers are defined by FAA Order 7110.65R [an air traffic control handbook].  Air controllers are also subject to a common law duty of reasonable care.") (internal citation omitted).

Some courts have held that negligence claims arising out of an airline's decision to bar a passenger from boarding implicate airline safety and require that the court apply the standard of care enunciated in the FAA because the FAA "preempts 'the entire field of aviation safety.'" *Adams v. U.S. Airways Grp., Inc.,* 978 F. Supp. 2d 485, 494 (E.D. Pa. 2013) (quoting *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 1159, 365 (3d Cir. 1999)); *see Furnas v. Appalachian Power Co.,* ICB-23-00168, 2024 WL 3996084 (S.D.W. Va. Aug. 29, 2024) (noting that "[a]lthough the Fourth Circuit has not addressed whether the field of aviation safety is preempted by federal law . . . the Circuit Courts have, by and large, come to a consensus that the FAA preempts the field of air safety regulations") *appeal dismissed*, No. 24-1925, 2025 WL 900055 (4th Cir. Feb. 4, 2025).  On the other hand, some courts have applied state law to determine the applicable standard of care in the context of boarding.  *See, e.g., Mansour v. British Airways PLC,* BJR-18-01757, 2020 WL 1847750, at *3–4 (W.D. Wash. Apr. 13, 2020).

Neither party addresses which standard of care applies to plaintiffs' negligence claim. Defendant's Motion rests largely on its argument that plaintiffs have not alleged a compensable injury.  Moreover, United does not contend in its Motion that it did not breach its duty of care.

Maryland, a right to recovery exists for emotional distress 'if it results in physical injury.'") (quoting *Vance v. Vance,* 286 Md. 490, 494, 408 A.2d 728, 730 (1979)); *Alban v. Fiels,* 210 Md. App. 1, 61 A.3d 867, 876 (2013) ("Traditionally, recovery for emotional distress as an element of damage in a negligence action required proof of a physical injury or, in some instances, a physical impact.").

Contrary to United's suggestion, however, bodily injury is not required to state a claim for negligence. Rather, if "the emotional distress due to the tortious conduct is manifested objectively, the emotional distress is deemed genuine and compensable even though the tortious conduct did not cause bodily harm." *Albright*, 433 Md. at 350–51, 71 A.3d at 59; *see Ng-Wagner v. Hotchkiss,* No. 413, Sept. Term, 2016, 2018 WL 2277803, at *15 (Md. Ct. Spec. App. May 18, 2018); *Bragg v. Harco Distributors, Inc.*, WDQ-13-1950, 2014 WL 509524, at *3 (D. Md. Feb. 6, 2014); *see also Hoffman v. Stamper,* 155 Md. App. 247, 318, 843 A.2d 153, 195 (2004) ("[A] plaintiff can recover damages for emotional distress in a negligence action, in the absence of a physical impact, when the emotional distress has 'result[ed] in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicat[ive] of a resultant pathological, physiological, or mental state.'") (quoting *Vance,* 286 Md. at 500, 408 A.2d at 733 (alterations in original)), *aff'd in part, rev'd in part and remanded*, 385 Md. 1, 867 A.2d 276 (2005).

The element of physical manifestation is born out of concern that allowing claimants to recover for "mental distress alone" would open the door to plaintiffs who may "feign[]" emotional distress. *Albright*, 433 Md. at 350, 71 A.3d at 59; *see Hoffman,* 385 Md. at 34, 867 A.2d at 296; *see also Ross v. F.D.I.C.*, 625 F.3d 808, 818 (4th Cir. 2010) ("[B]ecause emotional distress is fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims. And this is precisely why conclusory statements that the plaintiff suffered emotional distress do not

support an award of compensatory damages.") (cleaned up) (internal citation omitted).  "Physical injury provides 'the objective manifestation of the alleged emotional injury,' and serves 'as the yardstick by which a tort victim's emotional harm may be measured.'"  *Bragg*, 2014 WL 509524, at *3 (quoting *Beynon v. Montgomery Cablevision Ltd. P'ship*, 351 Md. 460, 507, 718 A.2d 1161, 1184 (1998)).

However, "the term 'physical' [is] not used in its ordinary dictionary sense, but instead 'is used to represent that the injury for which recovery is sought is capable of objective determination.'"  *Hoffman,* 385 Md. at 34, 867 A.2d at 733–34 (quoting *Vance,* 286 Md. at 500, 408 A.2d at 733).  Objective manifestations of emotional distress can include "'depression, inability to work or perform household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs.'"  *Wolff v. Magal*, No. 819, Sept. Term, 2021, 2022 WL 2282682, at *7 (Md. Ct. Spec. App. June 23, 2022) (quoting *Wheeling*, 473 Md. at 395, 250 A.3d at 220); *see Bragg*, 2014 WL 509524, at *3.

Of import, "for an injury to be capable of objective determination, the evidence must contain more than mere conclusory statements, such as, 'He was afraid,' or, 'I could see that he was afraid.'" *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 531, 710 A.2d 362, 369 (1998); *see also Hoffman*, 385 Md. at 34, 867 A.2d at 296 ("[R]ecovery for emotional injury would not be allowed based on the plaintiff simply saying, 'This made me feel bad; this upset me.'").  But, "under Maryland law, an individual need not seek compensation for medical treatment to justify a compensatory noneconomic damages award."  *Nicholson*, 162 F.4th at 428 (citing *Brooks v. Jenkins*, 220 Md. App. 444, 476, 104 A.3d 899, 917–18 (2014) and *Francis v. Johnson*, 219 Md. App. 531, 562, 101 A.3d 494, 512 (2014)).

Both parties rely on cases decided by the Maryland Court of Appeals[8] and the Maryland Court of Special Appeals: *Vance*, 286 Md. 490, 408 A.2d 728, and *New Summit Assocs. Ltd. P'ship v. Nistle*, 73 Md. App. 351, 533 A.2d 1350 (1987).  *See* ECF 39 at 7; ECF 40 at 4–6.  These cases are instructive in considering the type of physical manifestations of emotional distress that Maryland courts consider necessary to proceed with a negligence claim.

In *Vance,* 286 Md. at 492, 408 A.2d at 729, the plaintiff, Muriel Vance,[9] discovered that her ostensible marriage of eighteen years to Arnold Vance had never actually taken place.  At the time of the wedding ceremony,  Arnold erroneously believed that his divorce decree from his previous marriage had taken effect.  *Id.* at 493, 408 A.2d at 729.  He discovered the truth about the legal status of his marriage to Muriel one month after their wedding ceremony but did nothing to rectify the situation.  Nor did he share this information with Muriel.  *Id.* at 493, 408 A.2d at 729–30.

Arnold and Muriel lived together as husband and wife for eighteen years and had two children together.  Then, Arnold left Muriel for another woman.  When Muriel sought a divorce, Arnold attempted to "annul the marriage on the ground that the marriage was void because he was not divorced from his first wife at the time he purported to marry Muriel."  *Id.* at 492, 408 A.2d at 729.

---

[8] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland.  These changes went into effect on December 14, 2022.  *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR.  But, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

[9] Because the parties in *Vance* share the same last name, I will refer to them by their first names.

Muriel initiated suit against Arnold for "compensatory damages for emotional distress which she claimed to have suffered as a consequence of [Arnold's] negligent misrepresentation concerning his marital status at the time of their ostensible marriage[.]" *Id.* at 492–93, 408 A.2d at 729. She testified at trial that after Arnold sought to annul their marriage, she "'couldn't function'" and "'couldn't sleep'" and was so embarrassed that she could not "'go out and socialize with people that tried to be kind to'" her. *Id.* at 493, 408 A.2d at 730. Muriel thought she "'was going to have a nervous breakdown'" and, at the time of trial, had "'symptoms of an ulcer.'" *Id.*

The Vances' son testified about his mother's deterioration after she discovered the truth regarding her marital status. *Id.* at 494, 408 A.2d at 730. He recounted that he had trouble "communicating with his mother" because "she appeared detached, unaware of her own presence, and spent long periods of time crying and sobbing" and that he feared "that his mother would end up in an asylum." *Id.* Moreover, he said his mother "changed from that of a woman of beauty to a person who looked 'a wreck,' with unkempt hair, sunken cheeks, and dark eyes." *Id.*

During trial, "[n]o medical evidence" was introduced "to substantiate Muriel's claim of emotional distress." *Id.* Nor did plaintiff produce any evidence that she "took any medication for her condition." *Id.*

The jury returned a verdict in favor of Muriel on the claim of negligent misrepresentation. *Id.* But, the trial court entered a judgment N.O.V. for Arnold. *Id.* The Court of Special Appeals reversed, finding that "'the evidence'" at trial supported "'a finding by the jury of physical injury from (Muriel's) 'external condition.' (Muriel's) nervousness, spontaneous crying, hollowed appearance, and inability to relate to the present, all constituted evidence of an external condition.'" *Id.* at 495, 408 A.2d at 730 (quoting *Vance*, 41 Md. App. at 137, 396 A.2d at 301) (alternations in original).

The Maryland Court of Appeals agreed, concluding that the evidence was "legally sufficient to establish symptoms of a mental state evidencing a physical injury" for Muriel's negligent misrepresentation claim. *Id.,* 286 Md. at 501, 408 A.2d at 734. The court determined that the "evidence showed that Muriel suffered an objectively manifested, definite nervous disorder", citing her "spontaneous crying", appearing "detached and unaware of her own presence", her inability "to function normally", her inability "to sleep", and her crippling embarrassment that left her "too embarrassed to socialize." *Id.* The court also noted the physical manifestation of Muriel's suffering: she experienced symptoms of an ulcer and her physical appearance "significantly deteriorated[.]" *Id.*

In *Nistle*, 73 Md. App. 351, 533 A.2d 1350, the Maryland Court of Special Appeals engaged in a thorough analysis of the harm required to recover for emotional injuries under a negligence theory. The plaintiff, Sylvia Nistle, was a tenant in an apartment complex when various apartments were undergoing renovations. *Id.* at 356, 533 A.2d at 1352. Shortly after Nistle moved into her apartment, the apartment next door began renovations. *Id.*, 73 Md. App. at 357, 533 A.2d at 1353. Nistle's apartment "shared a common partition wall with the bathroom of an adjacent apartment on her floor." *Id.* During these renovations, "workers removed the mirror from" the apartment adjacent to Nistle's unit, "exposing the rear" of Nistle's "bathroom mirror." *Id.* Nistle discovered that two peepholes had been scratched into the rear of her bathroom mirror, allowing people in the adjacent apartment to peer into her bathroom. *Id.*

This discovery caused Nistle "great anxiety." *Id.,* 73 Md. App. at 358, 533 A.2d at 1353. Nistle "vacated her apartment and moved into her parents' house[.]" *Id.* at 359, 533 A.2d at 1354. She "experienced nausea, diarrhea, and an inability to sleep for several weeks following her

discovery of the probable invasion of the privacy of her bathroom" and underwent "psychiatric counseling." *Id.*

Nistle sued her former landlord for negligence and other claims. *Id.* at 355, 533 A.2d at 1352. The jury awarded damages. *Id.* On appeal, the landlord challenged the verdict on the basis that there was "insufficient evidence of negligence to warrant submission of" Nistle's "negligence claim to the jury." *Id.* at 356, 533 A.2d at 1352. The court affirmed, concluding that Nistle's negligence claim was "properly submitted to the jury." *Id.* at 363, 533 A.2d at 1355. In its view, Nistle's "nervous shock, resulting in nausea, diarrhea, and an inability to sleep, was . . . a compensable injury caused by" her landlord's negligence. *Id.* at 362–63, 533 A.2d at 1355.

Here, plaintiffs claim that they "endured considerably more" emotional suffering than the plaintiffs in *Vance* and *Nistle.* ECF 39 at 7. They assert, *inter alia*, that they were forcibly led out of the airport by armed police officers, which was traumatic and humiliating. ECF 25, ¶ 10. Defendant argues that, unlike the plaintiffs in *Vance* and *Nistle,* plaintiffs' allegations of emotional distress "are all subjective feelings that the Plaintiffs do not claim manifested into external conditions and are not capable of objective determination." ECF 40 at 5. Moreover, United seems to overlook that the evidence as to emotional injuries adduced in *Vance* and *Thistle* took place at trial. To survive a Rule 12(b)(6) motion, however, plaintiffs need not allege the quantum of facts that may be necessary to prove a claim at a trial. *See, e.g.,* ECF 25, ¶¶ 64, 81.

The court's analysis in *Wheeling*, 473 Md. 356, 250 A.3d 197, illustrates this point. In *Wheeling,* the plaintiffs sued a mortgage servicer and real estate broker, claiming that the defendants "posted eviction notices on" the plaintiffs' "properties, attempting to gain possession of the properties through self-help measures without a court order." *Id.* at 364, 250 A.3d at 202. In their complaint, the plaintiffs alleged that they "incurred legal expenses by seeking legal advice

to understand their rights as tenants on the property" and suffered "emotional distress with physical manifestations" because of the mortgage servicer's actions. *Id.* at 368, 250 A.3d at 204; *see also id.* at 399, 250 A.3d at 222 (plaintiffs claiming in their Amended Complaint that they suffer "'emotional damages and losses with physical manifestations'" because of defendants' actions).

The circuit court granted defendants' motion to dismiss the amended complaint for failure to state claim, without leave to amend. *Id.* at 370–71, 250 A.3d at 205. Among defendants' grounds to dismiss this case was that plaintiffs "did not sufficiently plead damages in their complaint and could not show any accompanying physical manifestations of their emotional distress." *Id.* at 371, 250 A.3d at 205. The Court of Special Appeals affirmed the dismissal of plaintiffs' claims. *Id.* But, the Maryland Court of Appeals reversed. It concluded that the plaintiffs had "sufficiently pleaded damages for emotional injury." *Id.,* at 366, 398, 250 A.3d at 203, 222.

The court, citing cases involving plaintiffs seeking to recover in negligence actions where they sustained emotional injuries, reiterated: "In Maryland, a right to recovery exists for emotional distress 'if it results in physical injury.'" *Id.* at 393, 250 A.3d at 219. It explained, *id.* at 399, 250 A.3d at 222 (emphasis and alterations in original) (quoting *Hoffman*, 385 Md. at 35, 867 A.2d 296):

> Although the plaintiffs will be required to *prove* that their emotional injuries are accompanied by physical injuries that are capable of objective determination, the specifics of such objective manifestations have 'more to do with *proving*, rather than defining, this kind of injury.' We note, however, that *pleading* emotional damages with physical manifestations is a much different hurdle than *proving* the same.

As to Kim, plaintiffs allege that she "was in tears" after United refused to allow her to reboard the aircraft. *Id.* ¶ 51. This is sufficient to constitute a physical manifestation of emotional injury.

The remaining plaintiffs allege, *inter alia*, that they were forcibly removed from the terminal by armed law enforcement officers and experienced embarrassment and humiliation as a result.  ECF 25, ¶¶ 71, 82, 88.  However, they do not allege in the Complaint that they experienced any physical manifestations of harm.  Rather, they assert: "The behavior and actions of the Defendant's agents caused the Plaintiffs a great deal of hardship, embarrassment and suffering, causing their mental and emotional suffering."  *Id.* ¶ 81.

In my view, these assertions are insufficient to withstand dismissal.  *See Hobson v. Transit Emps. Health & Welfare Fund, LLC,* PX-25-00146, 2025 WL 2444158, at *5–6 (D. Md. Aug. 25, 2025) (finding allegations were too "vague and conclusory" to sustain a negligence claim when plaintiff merely alleged that "because of 'Defendants' negligence and/or negligent handling,' [plaintiff] has 'suffered or will suffer damages, including embarrassment, humiliation, frustration, anxiety, emotional distress, and fear' alongside an 'increased risk' of being denied housing and jobs") (quoting plaintiff's complaint); *Coleman v. Immaculate Heart of Mary Sch.,* CCB-11-02917, 2012 WL 75323, at *1 (D. Md. Jan. 9, 2012) (dismissing plaintiff's negligence claim because his allegations did not meet the standard under Maryland law to "recover damages for emotional injury"; plaintiff had claimed only that defendant's actions "'caused harm to his reputation, undue mental anguish and personal humiliation'") (quoting plaintiff's complaint).

Accordingly, on this basis, as to Chiao, Parvanova, and Simmons, I will dismiss the negligence claim, without prejudice, and with leave to amend.

## B. The ADA and Preemption

United also urges dismissal of plaintiffs' negligence claim on preemption grounds.  It contends that the suit is "based on United's boarding practices" and is therefore preempted by the ADA, 49 U.S.C. § 41713(b)(1).  *See* ECF 36-1 at 25; *see also id.* at 23.  In particular, United claims that "the ADA preempts claims against commercial air carriers when the claim references or

connects to the airlines rates, routes, or services." *Id.* at 8. According to United, this preemption extends to "an airline's boarding practices and procedures" and "claims for denied boarding or requests for involvement of law enforcement to remove passengers from the boarding process[.]" *Id.*

I decline to address this complex issue because I have granted defendant's Motion on other grounds. *Cf. Abdu-Brisson v. Delta Airlines, Inc.*, 128 F.3d 77, 81 (2d Cir. 1997) (describing how the ADA's preemption standard in "its practical application in particular circumstances is difficult[.]"); *Air Evac EMS, Inc. v. Cheatham,* 910 F.3d 751, 770 (4th Cir. 2018) ("The balance of state and federal responsibility created by the ADA is a complex balance[.]").

## IV.    Conclusion

For the foregoing reasons, I shall grant United's Motion, without prejudice and with leave to amend.

An Order follows, consistent with this Memorandum Opinion.


Date:   January 30, 2026                                    _____/s/_____
                                                           Ellen Lipton Hollander
                                                           United States District Judge